### UNITED STATES v. NAGLER.

(District Court, W. D. Wisconsin. July 25. 1918.)

1. CRIMINAL LAW ⬤⇒304(1)—JUDICIAL NOTICE—WAR ACTIVITIES—RED CROSS.

The government having constituted the American Red Cross an important factor of the national war activities, the court must take judicial notice of many Red Cross activities.

2. WAR ⬤⇒4—PERSONS IN SERVICE—RED CROSS—ESPIONAGE—"MILITARY AND NAVAL FORCES OF THE UNITED STATES."

The American National Red Cross, having been employed as a part of the sanitary service of the army and navy, is a part of the "military or naval forces of the United States," within the meaning of Act June 15, 1917, c. 30, § 3, as amended May 16, 1918, providing punishment for those making false statements with intent to hinder the success of such forces.

[Ed. Note.—For other definitions, see Words and Phrases, First Series, Military Forces; Naval Forces.]

3. WAR ⬤⇒4—MILITARY AND NAVAL FORCES OF THE UNITED STATES—PERSONS IN SERVICE—ARMY Y. M. C. A.

The Y. M. C. A., as recognized by the President of the United States and engaged in raising funds for and in serving the soldiers and sailors, is a part of the "military and naval forces of the United States," within the terms of Act June 15, 1917, c. 30, as amended May 16, 1918, prohibiting interference with the successful operation of such forces.

4. WAR ⬤⇒4—MILITARY AND NAVAL FORCES OF THE UNITED STATES—RED CROSS—INTERNATIONAL TREATIES—MILITARY OR NAVAL SERVICE—ESPIONAGE.

The official recognition of the Red Cross by international treaties, particularly the Treaty of Geneva of August 22, 1864, whereby members captured were to be treated as neutrals, does not prevent recognition of the Red Cross as a part of the "military and naval forces of the United States," under Act June 15, 1917, c. 30, as amended May 16, 1918, prohibiting interference with the operation of such forces.

5. WAR ⬤⇒4—MILITARY FORCES—ESPIONAGE—INTERFERING WITH RAISING MONEY FOR ARMY Y. M. C. A. AND RED CROSS WORK.

The making of false statements concerning the Army Red Cross and Army Y. M. C. A. and the government's management of the war, to persons soliciting funds to carry on war work, if intended to interfere with raising such funds, and with "the operation or success" of the "military or naval forces," is punishable under Act June 15, 1917, c. 30. as amended May 16, 1918.

⬤⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Louis B. Nagler was indicted for violation of Espionage Act, § 3. On motion to quash the indictment. Motion denied.

Albert C. Wolfe, U. S. Atty., of La Crosse, Wis., and B. R. Goggins, Sp. Asst. Atty. Gen., for the United States.

Crowhart & Wylie and Burr W. Jones, all of Madison, Wis., for defendant.

EVAN A. EVANS, Acting District Judge. Defendant moves to quash the indictment returned against him, because it fails to state facts sufficient to charge him with the commission of a crime. Section 3 of the Espionage Act, in force at the time the offense is alleged to have been committed, approved June 15, 1917 (40 Stat. 219, c. 30), reads as follows (the paragraphing, as well as the figures in parentheses are mine):

"Whoever, when the United States is at war,

"(1) Shall willfully make or convey false reports or false statements with intent to interfere with the operation or success of the military or naval forces of the United States or to promote the success of its enemies,

"(2) And whoever, when the United States is at war, shall willfully cause or attempt to cause insubordination, disloyalty, mutiny, or refusal of duty, in the military or naval forces of the United States,

"(3) Or shall willfully obstruct the recruiting or enlistment service of the United States, to the injury of the service or of the United States,

"Shall be punished by a fine of not more than $10,000 or imprisonment for not more than twenty years, or both."

The indictment charges defendant with having spoken the following words in the presence of numerous people whose ages do not appear, to wit:

"I am through contributing to your private grafts. There is too much graft in these subscriptions. No; I do not believe in the work of the Y. M. C. A. or the Red Cross, for I think they are nothing but a bunch of grafters. No, sir. I can prove it."

"I wont give you a cent. The Y. M. C. A., the Y. W. C. A., and the Red Cross is a bunch of grafters. Not over 10 or 15 per cent. of the money collected goes to the soldiers or is used for the purpose for which it is collected."

"Who is the government? Who is running this war? A bunch of capitalists composed of the steel trust and munition makers."

From the entire indictment it is apparent that defendant, in referring to the Y. M. C. A. and the Red Cross, was referring to these organizations and their activities in the present war. Upon this motion to quash, the defendant, for the purpose of the argument, admits the utterance of the words, as well as the other allegations of fact set forth in the indictment.

A consideration of this motion to quash requires an analysis of section 3 of the Espionage Act as it was originally enacted, and also an analysis of the statements by the defendant made. Section 3 of the Espionage Act naturally divides itself into three subdivisions, represented by paragraphs (1), (2), and (3), above set forth. We are interested primarily with subdivision (1), for it is this subdivision that defendant has violated if any violation has occurred. Subdivisions (2) and (3) are worthy of consideration only in so far as they throw

light upon the construction to be given to the words "military or naval forces of the United States" as they appear in subdivision (1).

An examination of the words spoken by defendant leads to an analysis of what was said into—

(a) What was said about the Red Cross,

(b) About the Y. M. C. A.,

(c) About the government and those who are running the war, and the influence of the capitalists in the conduct of the war.

Defendant calls for a strict construction of the statute, and denies that the utterance of any words spoken of the Red Cross or the Y. M. C. A. can be construed as a violation of this subdivision (1) of section 3 of the act. This position is based upon the premise that the Red Cross and Y. M. C. A. are no part of "the military or naval forces of the United States." He further contends that words spoken to parties not members of the Red Cross or Y. M. C. A. in reference to subscriptions to these organizations were not reasonably adapted to accomplish the result of interfering with "the operation or success" of either organization, conceding that such organizations are a part of the military or naval forces of the United States. In support of their contention they cite the recent decisions of Judge Bourquin in U. S. v. Ves. Hall, 248 Fed. 150, of Judge Amidon in U. S. v. Schutte, 252 Fed. 212, of Judge Lewis in U. S. v. Hitt, Bulletin No. 53, and of Judge Anderson in U. S. v. Zimmerman, (no opinion filed).

The government contends, on the other hand, that the language spoken by the defendant to various individuals when a "drive was on" for the Red Cross and the Y. M. C. A., with the intent to interfere with the success of such drives, was a clear violation of subdivision (1) of said section. While contending that such language, in view of the activities of and the part taken by the Red Cross and the Y. M. C. A. in this war, is actionable, it especially contends that it is actionable to speak of the Red Cross in such manner, because that organization is a national corporation, incorporated January 5, 1905, and created for the purpose of perfecting a permanent organization as an agency of this government needed by it to carry out the purposes of the treaty entered into at Geneva, Switzerland, August 22, 1864 (22 Stat. 940), the general objects of which treaty were to mitigate the evils inseparable from war, and to ameliorate the conditions of soldiers wounded on the field of battle; that the governing body of the American National Red Cross consisted of a central committee, six chosen by the President of the United States, six elected by delegates from states and territories, and six elected by the board of incorporators; that the President of the United States is the president of the corporation; that the various states and territories within the United States have been organized as a part of this corporation, the membership in which now exceeds 300,000, organized locally into chapters; that a further purpose of the corporation is to furnish voluntary aid to the sick and wounded of our army and navy in time of war, and, to carry out such object, to equip and manage hospitals, hospital ships, trains, transportation for the sick and wounded, to manufacture, collect, store, and distribute war relief supplies, and to serve as a means

of communication between the people of the United States and their army and navy; that in time of war the President of the United States may use and employ the Red Cross, with the sanitary service of the land and naval forces of the army and navy, in conformity with such rules and regulations as he may prescribe; that prior to the utterance of the words set forth in the indictment by the defendant the American National Red Cross tendered its assistance to the government, and the President of the United States, pursuant to the authority upon him conferred, accepted and employed the same under the sanitary service of the army and navy, and promulgated rules and regulations governing the status, organization, and operation of the Red Cross; that among the rules and regulations which the President thus announced the Red Cross units serving with the land forces were made and constituted a part of the sanitary service of the land and naval forces of the United States.

[1] Other facts are set forth in the indictment, showing the official action of the government in constituting the Red Cross an important factor of the war activities of the nation, and the court must take judicial notice of many other activities of this worthy organization in these times. Appropriate allegations appear in the indictment showing the nature of the Y. M. C. A. and the character of the services rendered by this organization as an agency of the government of the United States, and particularly its activities in bettering the moral conditions surrounding its military and naval forces in field and military camps. Among other things it is asserted that the Y. M. C. A., as such an agency of the United States government, "had heretofore received official recognition by Woodrow Wilson, as commander in chief of the army and naval forces of the United States and President of the United States, as a valuable adjunct and asset to the military and naval service of the United States."

In support of its position the government cites numerous cases, among others the following decisions: Of Judge Munger, U. S. v. Frerichs, Bulletin No. 85; of Judge Munger, U. S. v. Pundt, Bulletin No. 82; of Judge Neterer, U. S. v. Zittel, Bulletin No. 90; of Judge Dayton, U. S. v. Kirchner, Bulletin No. 69; of Judge Neterer, U. S. v. Wells, Bulletin No. 70; of Judge Van Valkenburgh, U. S. v. Stokes, Bulletin No. 106; of Judge Aldrich, U. S. v. Taubert, Bulletin No. 108; of Judge Ray, U. S. v. Pierce, Bulletin No. 52, and others. These decisions have not as yet appeared in the Federal Reporter, but the government has published them in pamphlet form, numbering the bulletins. Adopting the language of Judge Munger in U. S. v. Frerichs, the government's position is that if a remark is false in character and reasonably capable of producing resulting action by others which would interfere with the operation or success of the government's military or naval forces, and such remark "is made with the intent that it shall influence the hearers, so as to dampen their ardor in the war and to deter them from subscribing to bonds or thrift stamps or aiding the Red Cross, or to giving their active and loyal support to the activities of the country in the prosecution of the war, * * * the jury could say that that was with the intent to interfere with the operation

and the success of the military forces, because whatever interferes with the loyal support at home interferes with the success of the forces abroad."

[2, 3] Defendant argues for a strict construction of this statute, because it is a criminal statute, and further that Congress by amending the act (Act May 16, 1918, c. 75) in the manner in which it was amended, thereby construed its own act and adversely to the now asserted position of the government. It does not appear to me that the term "military or naval forces of the United States" can fairly be defined or construed so as to exclude either the Red Cross or the Y. M. C. A. This result defendant asserts would lead necessarily to the conclusion that a violation of the act occurs when one speaks falsely and with bad intent concerning the Knights of Columbus, the Salvation Army, or the Jewish Relief organization. With this position I agree.

Not only would it be a violation of the law to interfere with the drives conducted for the raising of funds for the Y. M. C. A., but it would likewise be a similar offense if the opposition was directed to the work of those engaged in raising funds for the Knights of Columbus, the Jewish Relief, or the Salvation Army. Of course, in speaking of these organizations, I am speaking of the war organizations under these names, recognized by some department of our government, and not of these organizations in time of peace. No other conclusion would be logical. In a republican form of government, like ours, with war conducted as it is to-day, there should and can be no refined or limited definition of the term "military or naval forces." The forces that actually fight on the battle field, and the forces that produce the food and arms and munitions at home, are so related and interdependent that it is impossible to say one belongs to the military forces and the other does not. The doctor who fits the recruit for life in the camp or trench renders a service very similar in nature and character to the officer who trains the recruit in the rudiments of warfare. The surgeon who mends the injured limbs that the fighter might return to the trench is not different from the aides who examine and repair the aeroplane that is used by the flier to drop bombs on the enemy. Yet the doctor belongs to the sanitary department of our army and navy, and defendant admits that under his construction of the act doctors cannot be included as a part of the army and navy.

[4] It is, however, strenuously contended that because the Red Cross was officially recognized by international treaties, and particularly in the treaty concluded at Geneva, Switzerland, wherein and whereby members of the Red Cross are to be treated as neutrals and in case of capture, are to continue in their same occupation, it would be illogical and embarrassing in the extreme if this court were to give such construction to this act, so as to make members of the Red Cross belligerents. In my opinion recognition of the Red Cross as a part of the "military or naval forces" of the United States would not relieve any country that is a party to this treaty from according such members the treatment required by the terms of the treaty. The important provisions of the treaty concluded at Geneva on August 22, 1864, provided:

"Article I. Ambulances and military hospitals shall be acknowledged to be neuter, and as such shall be protected and respected by belligerents so long as any sick or wounded may be therein. Such neutrality shall cease if the ambulances or hospitals should be held by a military force."

"Art. III. The persons designated in the preceding article may, even after occupation by the enemy, continue to fulfill their duties in the hospital or ambulance which they serve, or may withdraw in order to rejoin the corps to which they belong."

"Art. VI. Wounded or sick soldiers shall be entertained and taken care. of, to whatever nation they may belong.

"Art. VII. A distinctive and uniform flag shall be adopted for hospitals, ambulances and evacuations. It must, on every occasion, be accompanied by the national flag. * * * The flag and the arm-badge shall bear a red cross on a white ground."

I find nothing in this agreement, even if it were not in any way affected by the act of Congress organizing the Red Cross, as well as the subsequent acts of the same body granting authority, power, and official sanction to the work of the Red Cross, that justifies the conclusion that the members of the Red Cross are not a part of the army and navy of the United States.. It is true this branch of the service is entitled to special protection, and was the legitimate subject of consideration by the various countries that signed the treaty aforementioned. The countries that signed this treaty merely recognized the humane purposes for which military hospitals are created, provided protection for them during the siege, and gave those connected therewith special privileges and immunities in case of capture.

Nor do I think the amendment to this act in 1918 justifies the court in giving the narrow construction to section 3 for which defendant contends. An examination of the debates in Congress, as well as a study of the section, warrants the conclusion that a part of the amendment was to make more clear and definite and specific the intent and purpose of Congress in enacting the original act. Viewing the situation as it existed in May, 1918, Congress was confronted with the necessity of making the act so specific and definite that the doubt (which existed only in certain localities by reason of certain adverse decisions) would be entirely removed.

[5] The argument that the words spoken were not capable of doing injury to the army and naval forces of the United States, because no army or navy camps existed in the vicinity of Madison at the time these words were spoken, obviously falls, in view of what has heretofore been said. To hold otherwise would lead to most intolerable and illogical conclusions. Can a man who contaminates the spring at its source avoid responsibility because the resulting damage occurs at the mouth of the stream? Can a resident of this country avoid responsibility for remarks, the effect of which is to interfere with the raising of the funds by which the Red Cross is maintained, when he would be liable if he interfered with the same organization in its field of activity? Without funds the organization cannot successfully carry on its work. In fact, one of the chief purposes of the organization is to convey from the giver (the citizen at home) to the citizen in arms that which means to the latter greater comfort and greater efficiency. This is possible only by the judicious use of the moneys donated by the sup-

porters of this war. To cripple the force collecting the funds by the spreading of false reports interferes with "the operation or success" of the work and is actionable.

What of the words: "Who is the government? Who is running this war? A bunch of capitalists composed of the steel trust and munition makers." These words cannot be dissociated from the other words spoken and quoted above. These words were spoken, it is charged, at a time when a "drive was on" for the Red Cross and the Y. M. C. A. in the city of Madison, and were uttered with the avowed purpose of interfering with the success of the drive. That such words might well accomplish such a purpose must be conceded; the asserted intention of the speaker, on this motion to quash, must likewise be taken as true. It appears, from what has been said before, that the Red Cross and Y. M. C. A. are a part of the "military or naval forces of the United States," and it follows that the defendant must plead to the indictment.

The motion to quash the indictment is denied.